C. STEPHEN AND BETTY BOEHM BABIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE,Respondent
Babin v. Commissioner
Docket No. 17993-89
United States Tax Court
T.C. Memo 1992-673; 1992 Tax Ct. Memo LEXIS 717; 64 T.C.M. (CCH) 1357; November 23, 1992, Filed *717 Decision will be entered under Rule 155. For Petitioners: J. Timothy Bender, Aaron H. Bulloff, and Timothy J. O'Shaughnessy. For Respondent: Jeffrey J. Erney. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1978
$ 130,730
1979
173,179
1982
76,768
After concessions, we must decide several issues in the instant case. The first issue we must decide arises from the discharge of a recourse mortgage debt of a partnership of which petitioner C. Stephen Babin (hereinafter petitioner) was a general partner. We must decide whether petitioners must recognize income from such discharge and, consequently, whether petitioner was insolvent at the time of such discharge. The second issue we must decide is the amount of capital gain to be recognized by petitioner upon the reduction in his share of partnership liabilities occasioned by such discharge. The third issue we must decide is the amount and character of loss petitioners must recognize upon the dissolution of another partnership in which petitioner held an interest. Lastly, we must decide whether petitioner *718 Betty Boehm Babin is entitled to certain net operating loss carryforwards for 1982. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Certain documents have been stipulated for trial pursuant to Rule 91. When the petition in the instant case was filed, petitioners resided in Fairview Park, Ohio. Immediately before petitioner's marriage to Betty Boehm Babin on January 17, 1976, they executed an antenuptial agreement listing all petitioner's assets. The Debt Discharge Transaction
Petitioner was a general partner in Lakewood Center Medical Construction Associates (LCMCA), an Ohio limited partnership. LCMCA's primary asset was the newly constructed Lakewood Center Professional Building (the medical building), a 7-story, 70,000 square foot office building adjacent to Lakewood Hospital. Petitioner held a 51-percent interest in the income and loss of LCMCA and a 75-percent share of its liabilities. The other general partner of LCMCA was James Carroll, who held a 17 percent profit/loss interest. LCMCA had six limited *719 partners, including Mrs. Babin. Cleveland Trust Company (CTC) held a first mortgage on the medical building of $ 3,300,110, a second mortgage of $ 660,014, and debtor's certificates of $ 220,782 (hereinafter collectively referred to as the "CTC mortgage"). All of the debt held by CTC was recourse as to the general partners. Because LCMCA was unable to make debt service payments, CTC foreclosed on the medical building and LCMCA filed a Chapter XII bankruptcy petition on April 13, 1977. In late 1977, LCMCA and CTC discussed a settlement of the partnership's debts. The total debt owed CTC by LCMCA was $ 5,170,019, but CTC offered to cancel the debt for $ 2,750,000, forgiving $ 2,420,019 of debt. On October 31, 1977, petitioner contracted to sell to Howard Schulman all of LCMCA's assets, including the medical building, as well as the partners' interest in LCMCA, for a total of $ 2,850,000, $ 64,000 of which represented a cash distribution to the partners. The remainder was used to pay various other creditors of LCMCA and expenses incident to the sale. On January 9, 1978, the bankruptcy court approved the settlement reached by LCMCA and CTC and dismissed the proceedings. LCMCA *720 sustained an ordinary loss of $ 442,265 on the disposition of the medical building, of which petitioner's share was $ 225,555. At the time of the sale, Mr. Schulman entered into a Management and Consulting Agreement with petitioner under which Mr. Schulman agreed to award Marwood, Inc., a property management firm owned by petitioner, a 2-year contract as managing and leasing agent for the medical building. Marwood would be compensated at the rate of 4 percent of gross rentals until "break even" cash flow was attained, and such fee would be increased to 5 percent if the "break even" level were attained for 3 consecutive months. Marwood would also receive a leasing fee of 5 percent of the gross lease amount for leases it negotiated. If the lease rate for the building did not exceed 60 percent within a year of Mr. Schulman's acquisition of the building, Mr. Schulman could cancel the contract. If, however, the lease rate was 80 percent within 18 months, the contract would be automatically extended for a year. Marwood would also receive a supervisory fee of 10 percent of cost for all construction in vacant areas of the building, and a design fee of $ 1.00 per square foot for design *721 work in areas to be leased up to 2,500 square feet, and a design fee of $ .75 per square foot for areas in excess of such size. Marwood was also allowed to bid on construction work to be done in the building. Under the Management Agreement, petitioner was entitled to 30 percent of annual cash flow, after payment of expenses and repayment of advances made by Mr. Schulman. Petitioner also was entitled to 30 percent of net proceeds from refinancing or sale of the property. Petitioner also entered into a purchase option agreement with Mr. Schulman concerning the medical building. Petitioner's basis in his interest in LCMCA prior to the debt discharge was $ 2,663,180, which includes a reduction for the distribution of petitioner's share, $ 32,640, or 51 percent, of the $ 64,000 cash payment to the partners of LCMCA by Mr. Schulman. Upon the discharge of the CTC mortgage, petitioner's basis was reduced by $ 3,877,514 (75 percent of $ 5,170,019). Petitioner's Assets as of January 9, 1978
Marwood, Inc.
Petitioner owned all of the stock of Marwood, Inc. (Marwood), the real estate management company which operated the medical building and other buildings in which petitioner *722 had an interest. The buildings generally were operated under management contracts which could be cancelled on 30 to 60 days notice. Usually, when a building was sold, Marwood was replaced as property manager. Marwood did not seek other properties to manage. Marwood usually received a management fee of between 4 and 5 percent of rental income, a commission on leases it obtained, and fees on construction work for tenants in the buildings. Marwood's assets included office equipment, cash, and receivables. Marwood's expenses exceeded its income in 1977. Marwood's income tax return for the year ended December 31, 1977, shows accounts receivable and assets equalling $ 143,842 and accounts payable of $ 137,180. The excess of assets over liabilities totals $ 6,662. Petitioner was Marwood's employee, but had no employment contract or noncompetition agreement with Marwood. In 1977, petitioner received a salary of $ 48,000 from Marwood, as well as a "commission" of $ 134,358. 14701 Detroit Corp.
Petitioner owned all the stock of 14701 Detroit Corp. (14701 Detroit), the principal assets of which were the INA Building and Annex, a modern 7-story office building, and the Lakewood *723 Center Building, a 3-story office building originally constructed as a department store in the 1920's and extensively remodelled in 1969. The buildings were in average to above-average condition as of January 10, 1978. Both buildings were located on the same block in downtown Lakewood, Ohio, and shared two and three level parking garages, as well as a surface parking lot, which had been constructed on such site for their tenants. The land owned by the corporation had been sold to a real estate investment trust (the REIT), and 14701 Detroit leased the land from the REIT for $ 175,000 per year at the time in issue. Certain of the land used for parking had been leased from the City of Lakewood in 1973 by Marwood, Inc., a corporate predecessor of 14701 Detroit. The other assets of 14701 Detroit had a value of $ 83,172 as of January 9, 1978. The buildings were encumbered by a first mortgage of $ 4,863,762, held by Broadview Savings and Loan. As of January 9, 1978, 14701 Detroit was in default on such mortgage. The REIT held a second mortgage of $ 200,000 on the buildings, which was also in default at such time. The mortgages had a higher payment priority than other corporate debts. *724 14701 Detroit was also in default on its land lease with the REIT at such time. As of the end of 1977, the corporation's cash flow fell $ 100,000 short of what was needed to service the debt. Petitioner held a note from 14701 Detroit in the amount of $ 746,511, which he received when he assumed a debt in such amount on the corporation's behalf. Such debt was included in a $ 1,000,000 nonrecourse note given by petitioner to CTC on January 9, 1978, which is discussed further below. Petitioner never wrote the 14701 Detroit note off as worthless on his tax returns. One of the tenants of 14701 Detroit's buildings was Control Data Corp. (Control Data) which, at the beginning of 1978, was considering moving out of the buildings because it wanted more space. In February 1978, petitioner began negotiating in earnest to try to keep Control Data, promising to secure additional space in the buildings. Control Data signed a 12-year lease with 14701 Detroit on March 30, 1978. The lease provided that Control Data would be able to terminate if the additional space were not made available. In order to provide the space, petitioner had to relocate two tenants in the building, who had not *725 agreed to move when the lease was signed. One tenant's space was to be available to Control Data in June 1978 and the other's was to be available in March 1979. Petitioner succeeded in relocating the tenants to the Lakewood Center North Building and made the space available to Control Data. The Control Data lease gave the buildings a positive cash flow of $ 200,000, and greatly increased the value of the 14701 Detroit stock. On May 7, 1979, petitioner sold his stock in 14701 Detroit for $ 1,740,157. Eastates Gas Producing Co.
Petitioner owned 30 percent of the stock of Eastates Gas Producing Co. (Eastates), which he purchased in the early 1970's. Eastates was an oil and gas exploration company, the income of which was derived from oil and gas royalties. Petitioner received the following dividends from Eastates: Year
Amount
1977
$ 1,950
1978
3,545
1979
2,150
1980
3,780
1981
0
1982
0
The Eastates stock eventually became worthless but was valued at $ 20,000 as of January 9, 1978. Petitioner also loaned $ 100,000 to Eastates in the early 1970s, receiving a debenture in return. Petitioner listed the debenture as an asset on his January 16, 1976, antenuptial *726 agreement, but did not claim a worthlessness deduction on its account on his 1977 through 1982 tax returns. The money was never repaid. Rockport Palisades Investment Associates
Petitioner owned a 78 percent interest in Rockport Palisades Investment Associates (RPIA) consisting of 70 general partnership units and 8 limited partnership units. Petitioner was the sole general partner of RPIA. The principal asset of RPIA was the Westlake Hotel (the Westlake), which the partnership acquired in 1974 for $ 1,355,978. The Westlake, a 1920s vintage structure, had been converted to apartments when RPIA acquired it. It was situated on a 5-acre parcel on the east bank of the Rocky River opposite Lakewood. The Westlake occupied half of the parcel, while the remainder of the parcel consisted of a steep hillside with a marina at its base. Certain retail businesses leased space at the Westlake and a yacht club leased the marina. From 1975 through 1977, operating income was not sufficient to meet debt service requirements, although a small operating profit was attained in 1978. On December 31, 1977, RPIA had liabilities of $ 1,332,720, which included accounts payable, notes payable, *727 and the mortgage, all of which were recourse as to petitioner. RPIA's payables included $ 96,582 owed to Marwood. Additionally, RPIA owed petitioner $ 176,601. No material changes in such liabilities occurred prior to January 9, 1978. As of such time, RPIA had other assets with a value of $ 2,963. In 1982, RPIA sold the Westlake for $ 1,637,500. The building was subsequently converted into condominiums at a cost of $ 3,000,000. Lakewood Center North Building Associates
Lakewood Center North Building Associates (LCNBA) was a limited partnership, of which petitioner was a general partner, formed to construct a 15-story office building known as Lakewood Center North. In January 1977, LCNBA was in bankruptcy due to negative cash flow, large deficits, and a lack of tenants. Between January and February 1977, Detroit Belle, a partnership controlled by another real estate developer, was admitted to LCNBA and took a 90-percent interest in such partnership. Furthermore, petitioner's interest was "deep frozen", meaning that Detroit Belle was entitled to all the cash flow from the building until its capital contributions were repaid, and thereafter would receive all of the profits, *728 losses, and cash flow until December 31, 1986, and 90 percent of such items thereafter. In return for its interest, Detroit Belle promised to put more capital into the property and assume liability for its mortgages. Neither petitioner nor LCNBA's limited partners received any cash distribution in connection with the deal. Petitioner reported a capital gain of $ 2,622,420 from the transaction on his 1977 tax return. Lakewood Center North Associates
Lakewood Center North Associates (LCNA) was a limited partnership which held certain vacant land near the Lakewood Center North Building. Petitioner was the general partner of LCNA, holding a 20-percent capital interest. The book value of LCNA's assets as of December 31, 1977, was $ 138,510, with the land valued at historical cost. No effort was made to sell the land or to appraise it at such time. LCNA had liabilities of $ 5,073, consisting of real estate taxes due, as of December 31, 1977. Petitioner's capital account at such time equalled $ 23,167. Associates for Investment in Lakewood
Petitioner held a 40-percent interest and was a general partner in Associates for Investment in Lakewood (AFIL), a limited partnership *729 which owned a 5-story retail and office building. Mr. James Carroll was also a general partner in AFIL. Petitioner also held a $ 22,500 note from AFIL on which he never received payment. AFIL had a negative cash flow, was barely able to service its mortgages, and was producing losses in 1977 and 1978. Petitioner made efforts to sell the partnership, and in mid-to-late 1978 the building was transferred in exchange for assumption of its $ 600,000 in mortgages, with no cash paid to the partnership. AFIL was dissolved after the building was sold. Petitioner made contributions to AFIL's capital of $ 80,095, which he never recovered. Venture Associates
Venture Associates (Venture) was a partnership which held a 3/4 working interest in an oil and gas well in southern Ohio. Petitioner held a 3/16 interest in Venture Associates. The production of the well was purchased by Ashland Oil, which in turn sent out checks to the various holders of interests in the well. Petitioner had no stake in Ashland Oil. Between 1977 and 1982, petitioner received distributions from Venture of between $ 119 and $ 5,531. Petitioners valued petitioner's interest in Venture at $ 20,000 based on a *730 capitalization of its income. Tucker Land Co.
Petitioner owned 3-1/2 limited partnership units of Tucker Land Co. (Tucker), a limited partnership which held a substantial amount of land along Mulholland Drive in the hills overlooking Los Angeles. Petitioner paid between $ 1,000 and $ 1,500 for his interest in Tucker. Petitioner reported losses of a few hundred dollars a year from his interest in Tucker for 1977 through 1979 and income of one to two hundred dollars from such interest for 1980 through 1982. Miscellaneous Assets
As of December 31, 1977, petitioner had a checking account with a balance of $ 387 and had no other bank accounts. No substantial changes in the balance of such account occurred between such date and January 9, 1978. Petitioner owned a life insurance policy with a cash surrender value of approximately $ 5,000 as of January 9, 1978. Petitioner owned personal property with an approximate fair market value of $ 9,000 on such date. Petitioner owned a 1970 Buick valued at $ 1,000 and a 1977 Buick valued at $ 7,000. Petitioner's Liabilities
As of January 9, 1978, petitioner's debts were as follows: Helen Fowerbaugh, $ 20,000; Nick Laslovich, *731 $ 7,000; Continental Bank, $ 64,800; LCNA, $ 42,700. On his 1978 tax return, petitioner claimed deductions for interest paid on all the aforementioned obligations. Petitioner was also liable on a $ 1,000,000 nonrecourse note held by CTC. Such note was issued on January 9, 1978, as part of the bankruptcy settlement in return for two judgments held by CTC, one against 14701 Detroit for $ 643,573.69, bearing 8 percent interest, and another against petitioner for $ 326,541.93, also bearing an 8 percent rate. In return for assuming 14701 Detroit's debt, petitioner received a note for $ 746,511 from the corporation. The CTC note was secured by any amounts which petitioner might receive under his agreements with the purchasers of the medical building, or the value of any interest in such building which petitioner might reacquire, and his interest in LCNBA. OPINION Cancellation of Indebtedness Income
The first issue we consider is whether petitioner must recognize income as a result of the forgiveness and discharge of the CTCmortgage. Section 61(a)(12) provides the general rule that gross income includes income from discharge of indebtedness. An exception to the general rule *732 of income recognition applies, however, where the taxpayer is insolvent both before and after a debt cancellation. Fifth Avenue-Fourteenth St. Corp. v. Commissioner, 147 F.2d 453, 457 (2d Cir. 1944), revg. 2 T.C. 516 (1943); Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 F.2d 95, 96 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933); Yale Avenue Corp. v. Commissioner, 58 T.C. 1062, 1072-1073 (1972). To the extent that a cancellation of an insolvent taxpayer's indebtedness renders the taxpayer solvent, income is recognized in the amount by which the taxpayer's assets exceed liabilities immediately after the cancellation. Haden Co. v. Commissioner, 118 F.2d 285 (5th Cir. 1941), affg. a Memorandum Opinion of the Board of Tax Appeals dated October 20, 1939; Estate of Delman v. Commissioner, 73 T.C. 15, 32 (1979); Lakeland Grocery Co. v. Commissioner, 36 B.T.A. 289, 291-292 (1937). Accordingly, we must apply the insolvency exception as of *733 January 9, 1978, the date the discharge and forgiveness of the CTC mortgage occurred. [1]
In the case of a discharge occurring in the context of a partnership, this Court has applied the insolvency exception at the partner level. [2]Gershkowitz v. Commissioner, 88 T.C. 984, 1009 (1987). The Second Circuit, however, disagrees with our holding in Gershkowitz. In Estate of Newman v. Commissioner, 934 F.2d 426 (2d Cir. 1991), *734 revg. T.C. Memo. 1990-230, the Second Circuit held that the insolvency exception should apply at the partnership level. We need not resolve the issue of whether the insolvency exception should apply at the partner or partnership level, however, in order to decide the instant case. [3] Under the Second Circuit's holding in Estate of Newman v. Commissioner, supra, the insolvency exception applies if the partnership is insolvent. [4] Respondent has made no argument, however, that petitioner is required to *735 recognize income under the Second Circuit's partnership level analysis in Estate of Newman, and we accordingly deem the issue conceded. Respondent does contend that petitioner realized income under this Court's partner-level analysis in Gershkowitz, and so we must decide whether petitioner was insolvent before and after the cancellation and discharge of the CTC mortgage.
Respondent argues that petitioners have failed to establish that petitioner was insolvent subsequent to the *736 discharge. Respondent's contention is grounded upon the assertion that the evidence offered by petitioners at trial was insufficient to sustain their burden of proof. Respondent points to the relatively few number of documents offered by petitioners with respect to petitioner's business affairs and the fact that petitioners relied primarily upon the testimony of petitioner and his accountants to satisfy their burden of proof. Contrary to respondent's assertion, we do not think that petitioners' failure to introduce additional documents represents an effort by them to avoid presenting unfavorable evidence. Rather, what appears to have been extensive documentation of petitioner's affairs at the time in question, was not available at the time of trial. The trial in the instant case was held 12 years after the transactions in issue, and many documents pertaining to the financial condition of petitioner's various enterprises were transferred to new owners when the entities were sold, were lost in office moves, or were discarded after LCMCA's bankruptcy proceeding ended. Furthermore, petitioner's accountant's car, which contained many of petitioner's original documents, was stolen *737 in 1983 and never recovered. Nonetheless, petitioners were able to place in evidence copies of certain of such missing documents. On balance, we find that the relative paucity of documents is more attributable to the ravages of time and events beyond petitioners' control than to trial tactics. Moreover, at trial we found the witnesses to be credible, and so, with certain exceptions noted below, we credit their testimony as sufficient to enable us to decide whether petitioner was solvent on the date in question. To resolve the solvency issue, we must decide whether petitioner had a positive net worth subsequent to the discharge and the extent of any increase in net worth attributable to such discharge. Accordingly, we must value each of petitioner's assets and liabilities as of January 9, 1978. The valuation of property is a question of fact, to be decided on the basis of all surrounding facts and circumstances. Crowley, Milner & Co. v. Commissioner, 689 F.2d 635, 636 (6th Cir. 1982), affg. 76 T.C. 1030 (1981); Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; *738 Estate of Jephson v. Commissioner, 87 T.C. 297, 303 (1986); Skripak v. Commissioner, 84 T.C. 285, 320 (1985). Although we must consider the entire record, we have broad discretion to decide what facts are most important in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason". Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated January 22, 1951. See also Hamm v. Commissioner, supra at 940 (ascertaining fair market value is a question of judgment rather than mathematics). We, however, must logically explain how we arrived at our conclusion. Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987). Petitioners have introduced expert opinion testimony in support of the claimed value of certain of petitioner's property on the date in question. We evaluate such opinion in light of the demonstrated qualifications of the expert and all other evidence of value. Parker v. Commissioner, 86 T.C. 547, 561 (1986). *739 As the trier of fact, however, we are not bound by the opinion of an expert witness where such opinion is contrary to our judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991), on appeal (8th Cir. 1992). While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. Moreover, even if only one party introduces an expert valuation, we are not required to accord such valuation total acceptance. Estate of Gilford v. Commissioner, supra at 56. If the opposing party shows to our satisfaction a substantial error in the expert's testimony, appropriate adjustments will be made. Estate of Gilford v. Commissioner, supra at 56. *740 With the foregoing principles in mind, we will decide the value of petitioner's assets. Petitioner's Assets
Marwood
Petitioners contend that the value of petitioner's 100-percent interest in Marwood on January 9, 1978, was $ 6,662, the excess of assets over liabilities shown on the balance sheet incorporated in its 1977 tax return. Respondent contends that Marwood had much greater value due to the management and consulting agreement petitioner had signed with Mr. Schulman covering the medical building. Respondent also points to the compensation paid to Marwood's employees, principally petitioner, contending that Marwood would have been profitable had so much of its income not been paid out for such purposes. Petitioners did not take into account any earning potential in valuing Marwood because they claimed it would have none without petitioner, who would have left its employ had the company been sold to a third party. Petitioners contend that all of Marwood's business depended upon petitioner's control of the properties it managed. A "key man" discount is appropriate where the value of a corporation is dependent upon the services of an individual. Estate of Huntsman v. Commissioner, 66 T.C. 861, 879 (1976); *741 Estate of Feldmar v. Commissioner, T.C. Memo. 1988-429; Estate of Yeager v. Commissioner, T.C. Memo. 1986-448. Petitioner's ability to leave the employ of Marwood at will and to set up a competing business, which would enjoy the benefit of his connections, would substantially depress the amount a buyer would be willing to pay for Marwood's stock. See Estate of Maddock v. Commissioner, 16 T.C. 324, 330-332 (1951). Furthermore, the absence of income from the company due to the large amount of compensation paid petitioner would also make Marwood exceedingly unattractive to a potential buyer. Royce C. McDougal, M.D., Inc. v. Commissioner, T.C. Memo. 1985-64. Marwood possessed contract rights of its own, which it would continue to hold even if petitioner were to leave upon a sale. The contracts with entities controlled by petitioner, however, ran for only a year and could be cancelled on 30 days' notice, except the medical building contract which had a 2-year life with the terms governing cancellation related to Marwood's performance under it. Although the *742 contract rights constituted a component of the value of the Marwood stock which should be taken into account in valuing it, the amount by which such contracts increased the value of the Marwood stock is uncertain and speculative. We therefore do not adjust the value of the stock to take account of them. Accordingly, we accept petitioners' value of the Marwood stock at $ 6,662. [5]
14701 Detroit Corp.
Petitioner owned all of the stock in 14701 Detroit, the principal assets of which were the 7-story INA office *743 building and annex and the 3-story Lakewood Center Building located in downtown Lakewood. Petitioner also held a note due from the corporation in the amount of $ 746,511, which was issued when CTC exchanged a note it held in such amount for a nonrecourse note on which petitioner was the obligor. Petitioners contend that the corporate stock and note had no value on January 9, 1978, because the properties had a negative cash flow in the amount of $ 100,000, and because the corporation was in default on the first and second mortgages on the buildings and on the lease payments for the land on which they stood. Furthermore, the value of the properties was less than the liabilities to which they were subject. Respondent counters by pointing to the fact that in May 1979 petitioner sold his stock in 14701 Detroit Corp. for $ 1,740,157 and that petitioner never took a deduction for worthlessness on account of either the stock or note. The increase in value relied on by respondent is largely attributable to petitioner's success in leasing spaces in the buildings to Control Data Corp., a high quality tenant. Such lease was not made, however, until March 30, 1978, and, due to several circumstances, *744 petitioner could not count on Control Data signing a lease at the time of the debt discharge. Control Data wanted more space at such time, and was considering moving elsewhere. Before Control Data would agree to stay, petitioner had to convince Control Data that he could provide the extra space in 14701 Detroit's buildings, which he could obtain only by persuading other tenants in the buildings to relocate. Control Data's lease provided that it could terminate such lease if certain of the extra space were not available by the end of August 1978. We find that it was uncertain in January 1978 whether petitioner would be able to accommodate Control Data, as the two did not even begin serious negotiations until after the LCMCA bankruptcy proceeding ended. Consequently, we find that the amount for which the stock was sold in May 1979 does not represent its value as of January 9, 1978. In order to establish the value of petitioner's interest in 14701 Detroit, petitioners introduced the expert testimony of Mr. Wesley Baker. Mr. Baker valued the buildings owned by 14701 Detroit using the income forecast method. He estimated income and expense using actual expenses for 1977, which *745 he found were within industry norms, adjusting the historical data by certain percentages to stabilize them, and discounting the income by a risk-adjusted capitalization factor. Based on his calculations, Mr. Baker concluded that the buildings were worth $ 4,605,000 on January 10, 1978. Mr. Baker also valued the buildings under the comparable sales approach, which yielded a value of $ 4,656,000, after adjusting the comparables to take account of the fact that 14701 Detroit did not own the land upon which the buildings stood. Mr. Baker opined that the value yielded by the income approach was the most reliable indicator of the buildings' value on the relevant date because they were income-producing properties which a buyer would value on such basis and because of the relative paucity of comparable building sales at such time. Respondent has not pointed to any serious flaws in Mr. Baker's methodology or results, and we have found none. Accordingly, we accept Mr. Baker's opinion as to the value of the subject properties. Adding such value to the value of 14701 Detroit's other assets, which we will assume equal the figures shown on the May 1978 balance sheet, its total assets on the *746 relevant date equaled $ 4,688,432. 14701 Detroit, however, owed substantial amounts in the form of mortgages and rent due under its land lease. Petitioners' primary evidence as to such liabilities is a balance sheet prepared at the end of May 1978; both petitioner and his accountant testified that the figures represented on such balance sheet approximated the liabilities outstanding on January 9, 1978. Respondent asserts that such figures are unreliable. We, however, are convinced that the properties were encumbered by mortgages as of January 9, 1978. We also find the balance sheet sufficiently corroborative of the testimony of petitioner and his accountant to allow us to render our best estimate of the outstanding amount at such time. In making our estimate, however, we do not accept in toto the figures in the balance sheet reflecting current liabilities, as such figures could include liabilities accruing after January 9, 1978. It appears that until rent under the new Control Data lease began in June 1978, 14701 Detroit's cash flow was negative, so liabilities were probably increasing through the end of May. Accordingly, the liability figures shown appear to be higher *747 than they would have been in January. Accordingly, we find that petitioners have established that 14701 Detroit's liabilities were $ 5,063,762 as of January 9, 1978. We note that actual liabilities on such date may have been higher, as 14701 Detroit was also in default on its lease payments, which equaled approximately $ 175,000 per year; however, petitioners have not proved the amount of such additional liabilities. Nonetheless, because the total liabilities which we have been able to estimate with reasonable accuracy exceed the value of the corporate assets and take priority over the note owed petitioner, we hold that his stock and note had no net value as of January 9, 1978. Eastates Gas Producing Co.
Petitioners claim that petitioner's equity interest in Eastates should be valued at $ 20,000, based on capitalization of its projected dividend income. We accept petitioners' valuation as reasonable given the level of dividends actually paid to petitioner and the condition of the company. Petitioners, however, claim that no value should be assigned to the $ 100,000 debenture. Petitioner maintains that the debt was written off prior to January 9, 1978, and that the company *748 had fallen apart by that time. We find petitioner's testimony concerning Eastates' financial condition credible. The available evidence suggests that Eastates was winding down, and that repayment of the $ 100,000 debenture was beyond its means. In fact, petitioner was never repaid the money he lent. Consequently, we ascribe no value to the debenture. RPIA Partnership Interest
Petitioners argue that the value of petitioner's interest in RPIA was negative on January 9, 1978, and that petitioner's liability for the obligations of RPIA wiped out any positive net worth he may have had on such date. Respondent, on the other hand, argues that petitioners have undervalued RPIA's assets, principally the Westlake, and accordingly have understated the value of the partnership interest on the valuation date. After due consideration, we agree with petitioners. In support of the value claimed, petitioners introduced Mr. Baker's expert valuation of the Westlake and the land on which it stood, which concluded that their fair market value was $ 1,095,000. The report's conclusion was based on the conclusion that the highest and best use of the building and the 2.5 acres on which it stood *749 was as rental apartments, and that the best use of the remaining 2.5 acres was for a condominium development. Mr. Baker accordingly valued the Westlake using the income expected from such use, based on historical data, and valued the balance of the land using comparable sales. Respondent argues that the Westlake should be valued on the basis of its use as condominiums, instead of rental apartments. It is a basic principle of valuation that the fair market value of property must reflect its highest and best use, whether or not the taxpayer intends to put it to such use. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). The highest and best use of property is "the reasonable and probable use that supports the highest present value" of property. Frazee v. Commissioner, 98 T.C. 554, 563 (1992) (quoting Symington v. Commissioner, 87 T.C. 892, 897 (1986)). A use may be considered highest and best if it is a use -- for which the property is adaptable and needed or likely to be needed in the reasonably near future * * *, not necessarily as the measure of value, but to the full extent *750 that the prospect of demand for such use affects the market value while the property is privately held. * * * [Olson v. United States, 292 U.S. 246, 255 (1934).]
Speculative or remote uses of property are not to be considered. Stanley Works v. Commissioner, 87 T.C. at 401-402. Mr. Baker testified that the highest and best use of the Westlake was not as condominiums, citing an overbuilt market, high interest rates, and the difficulty of converting the building. We accept Mr. Baker's opinion, and we find such circumstances indicated that, as of the valuation date, the Westlake would not be needed for condominium use in the reasonably near future, rendering such use remote. In fact, the Westlake was not converted into condominiums until 1982, some 4 years later. At trial, respondent did not offer any credible evidence to counter Mr. Baker's opinion. Consequently, we accept Mr. Baker's valuation of the Westlake at $ 1,095,000 on such date. Respondent does not dispute that RPIA's obligations exceeded that amount. Accordingly, we find that petitioner's interest in RPIA had no net value as of January 9, 1978. *751 LCNBA Partnership Interest
Petitioners contend that petitioner's interest in LCNBA was worthless as of January 9, 1978, because the terms upon which Detroit Belle entered such partnership in early 1977, precluded petitioner from receiving any distributions from the partnership until 1987 at the earliest. Respondent contends that the partnership interest had some value, citing the $ 2,622,420 of capital gain reported on petitioner's 1977 return. Petitioners reply that such gain was "phantom gain" reported to take account of the decrease in petitioner's share of partnership liabilities resulting from Detroit Belle's assumption of such liabilities, as required by sections 752, 741, 733, and 731. Petitioners point out that petitioner received no cash distribution in connection with Detroit Belle's admission. We agree with petitioners and attach no significance to such phantom gain. Moreover, we also note that petitioner's interest in LCNBA secured a $ 1,000,000 nonrecourse note owed to CTC, which would eliminate petitioner's equity in such interest. Accordingly, we find that petitioner's interest in LCNBA had no net value as of January 9, 1978. LCNA Partnership Interest
*752 Petitioners contend that petitioner's 20-percent interest in LCNA should be valued at $ 23,167, the amount of his capital account as of December 31, 1977. Respondent contends that such interest should be valued as 20 percent of the $ 138,510 book value of LCNA's assets. Petitioners contend the book value overstates the actual value of the assets, as petitioner testified that the market for commercial land in Lakewood was in collapse and that efforts to sell the property would have been futile. Petitioners, however, have made no attempt to quantify the amount of discount that should be applied to the book value of the land, and so we will accept such figure as the most reliable indicator of its value as of January 9, 1978. Accordingly, we find that the value of petitioner's interest in LCNA to be 20 percent of the book value of the assets of LCNA, net of the partnership's liabilities, or $ 26,687, as contended by respondent. Associates for Investment in Lakewood
Petitioners contend that petitioner's interest in AFIL and its $ 22,500 note had no value as of January 9, 1978. Respondent argues that petitioners have failed to establish worthlessness. After considering the *753 evidence, we find that petitioners have not entirely carried their burden of proof. AFIL had a negative cash flow position during the relevant time, and petitioner was obliged to make substantial cash contributions to it. Several months following the debt discharge, AFIL found a buyer who assumed the mortgages in exchange for the building. Such circumstances indicate that petitioner had no equity in the partnership as of January 1978. Petitioners, however, have not succeeded in establishing that petitioner's $ 22,500 note from AFIL was worthless as of the relevant time. Mr. Carroll was also a general partner in AFIL, and accordingly, was liable for its debts. Petitioners, however, have failed to show that Mr. Carroll's separate property was insufficient to pay the partnership's liabilities, and so they have failed to establish that the note was worthless. Consequently, while we do not attribute any value to petitioner's interest in AFIL, we will include the face amount of the $ 22,500 AFIL note in calculating petitioner's net worth as of January 9, 1978. Venture Associates
Petitioners contend that petitioner's interest in Venture was worth $ 20,000, based on a capitalization *754 of its income stream. Respondent contends that petitioners have not offered any evidence of value aside from petitioner's own testimony. An owner of property, however, may testify as to its value. Multibestos Co. v. Commissioner, 6 B.T.A. 1060 (1927). Based on the income petitioners reported from the investment, petitioner's valuation appears reasonable. Furthermore, respondent has not pointed to any specific flaws in petitioner's valuation. Consequently, we find that petitioner's interest in Venture was worth $ 20,000 as of January 9, 1978. Respondent has suggested that petitioner also owned an interest in Ashland Oil which he failed to take into account. However, based on the evidence, we are satisfied that petitioner held no interest in Ashland Oil on January 9, 1978. Ashland simply distributed to petitioner the amounts he was due by virtue of his interest in Venture. Tucker Land Co.
Petitioners contend, based on petitioner's testimony, that his interest in Tucker was worthless on the date of discharge. Respondent contends that petitioners have introduced no evidence to corroborate or support petitioner's testimony, which respondent *755 characterizes as unreliable. We, however, find petitioner's valuation to be reasonable, inasmuch as Tucker was producing losses at the time in question. Moreover, petitioner held a fairly small interest in Tucker, and so its value would be commensurately minor in any event. Accordingly, we find that petitioner's interest in Tucker had no value as of January 9, 1978. Account Receivable from LCMCA
Petitioner was due $ 32,640, his share of the $ 64,000 cash distribution. Both parties agree that such amount should be included in petitioner's assets without discount. Option Agreement
Respondent contends that petitioner's assets should include the purchase option agreement negotiated with Mr. Schulman. Petitioners contend that there was no such agreement, but we find that, inasmuch as CTC named it as part of petitioner's security for a $ 1,000,000 nonrecourse note, such an agreement more likely than not existed, although a copy was not placed in evidence. Not knowing the terms of such agreement, however, and considering petitioner's precarious financial position at the time of the discharge, it is impossible to assign any value to such agreement. The same can be said *756 of any rights to refinancing or sale proceeds granted to petitioner by the Management and Consulting Agreement he made with Mr. Schulman concerning LCMCA's medical building. The prospect of receiving anything on their account was too speculative on January 9, 1978, to permit any value to be assigned to them. Moreover, such rights served as security for CTC's $ 1,000,000 nonrecourse note, and we think it is safe to assume that such liability eliminated any equity petitioner may have had in them. Miscellaneous Assets
Petitioner held certain other assets in addition to his business holdings and investments. Certain of such assets are exempt from creditors' claims under Ohio law, and so are not to be counted in deciding the increase in net worth occasioned by the debt discharge, as such assets are not thereby freed from creditors' claims. Cole v. Commissioner, 42 B.T.A. 1110 (1940); Hunt v. Commissioner, T.C. Memo. 1989-335; Estate of Marcus v. Commissioner, T.C. Memo. 1975-9. Petitioner held a checking account with a balance of $ 387 as of December 31, 1977, and petitioners contend *757 that no material changes in such account occurred between such time and January 9, 1978. Ohio Rev. Code Ann. sec. 2329.66(A)(4)(a) (Baldwin 1991) exempts a debtor's cash on hand from creditors' claims to the extent of $ 400. The checking account therefore is not to be counted in deciding the extent of petitioner's solvency. Similarly, the cash value of petitioner's life insurance policy should be excluded, as it is exempt under Ohio Rev. Code Ann. sec. 3911.10. Personal property, such as apparel and household items are exempt to the extent of $ 200 per item under Ohio Rev. Code Ann. sec. 2329.66(A)(3) and (4)(b), respectively. Petitioners valued such property at $ 9,000, and we find that all of it should be excluded. Ohio Rev. Code Ann. sec. 2329.66(A)(2) exempts one automobile to the extent of $ 1,000. Petitioner's 1970 Buick was valued at $ 1,000, and we find such automobile should be excluded from the net worth calculation. A 1977 Buick owned by petitioners and valued at $ 7,000, however, is not excludable. Petitioner's Liabilities
At trial, petitioner testified that he owed certain sums to various individuals, but respondent contends that petitioners have not proved *758 the existence of such debts because copies of notes were not introduced at trial, nor were the creditors called to testify in their behalf. Petitioner, however, testified credibly concerning such debts, and his tax returns show deductions were claimed for interest payments to the persons named as his creditors. [6] Consequently, we find that, on January 9, 1978, petitioner personally owed the following amounts: $ 20,000 to Helen Fowerbaugh; $ 7,000 to Nick Laslovich; $ 64,800 to Continental Bank; $ 42,700 to LCNA. Because petitioner was a general partner of RPIA, and all of such partnership's liabilities were recourse as to him, we will also take into account the amount by which RPIA's liabilities exceeded its assets as of the valuation date, or $ 311,407.
*759 CTC held a nonrecourse note from petitioner in the amount of $ 1,000,000, which was secured by his interest in LCNBA, his option to reacquire the medical building, and certain cash flows from such building which petitioner might subsequently receive. Such note was issued January 9, 1978, in exchange for a $ 325,000 personal note owed by petitioner and $ 746,511 of debt owed by 14701 Detroit, which petitioner assumed. Petitioners do not contend that such nonrecourse note should be counted in arriving at petitioner's net worth, nor do we consider it appropriate to do so. Cf. Estate of Delman v. Commissioner, 73 T.C. 15, 32-33 (1979). See also Rev. Rul. 92-53, 1992-27 I.R.B. 7 (July 6, 1992). The foregoing discussion of petitioner's net worth as of January 9, 1978, is summarized in the Appendix. Based on the foregoing, we find petitioner was insolvent both before and after the discharge of the CTC mortgage. Accordingly, he recognizes no income from cancellation of indebtedness here. See Estate of Newman v. Commissioner, 934 F.2d 426 (2d Cir. 1991), revg. T.C. Memo. 1990-230; *760 Gershkowitz v. Commissioner, 88 T.C. 984 (1987). Gain Recognized Incident to Reduction in Partnership Liabilities
Respondent determined that petitioners recognized capital gain upon the forgiveness and discharge of the CTC mortgage debt because the deemed cash distribution attributable to the reduction in the partnership's liabilities exceeded their adjusted basis in their partnership interests. Secs. 731(a), 741, 752(b). Petitioners do not dispute the capital gain respondent determined with respect to petitioner Betty Boehm Babin, but do dispute the determination with respect to petitioner. We will accordingly consider such objections. In the statutory notice of deficiency, such capital gain was calculated generally as follows: Partnership basis
Total
C. Stephen Babin
Distribution of liabilities
100%    75%      Partnership interest
100%    51%      Basis increases:
Cleveland trust liabilities  $ 5,170,019 $ 3,877,514 Unsecured creditors  6,500 4,875 Legal and accounting  20,000 15,000 Total basis increases
5,196,519 3,897,389 Basis decreases:
Ordinary losses, 1974-78    (2,356,018)
(1,201,569)
Cash distribution, 1978    (64,000)
(32,640)
Adjusted basis
2,776,501 2,663,180 Reduction in partnership
liabilities (5,270,019)
(3,952,514)
Capital gain
2,493,518 1,289,334 *761 Petitioners argue that certain modifications of respondent's calculation should be made. First, they argue that petitioner should be treated as having received $ 99,923 of income instead of $ 279,776 of loss from the partnership in 1977. Such income apparently results from considering the forgiveness of the CTC mortgage as having occurred in 1977. We, however, have previously held that the forgiveness and discharge of the CTC mortgage occurred in 1978. Consequently, there is no justification for adjusting the ordinary losses determined by respondent for 1977. Petitioners also argue that petitioner's basis in his interest in LCMCA should be increased by $ 1,234,210, the amount of cancellation of indebtedness income which he would have recognized on the forgiveness of the CTC mortgage absent application of the insolvency exception. An increase in basis is only allowable, however, where the debt cancellation income is actually recognized, and no basis increase is warranted where application of the insolvency exception prevents such recognition. Gershkowitz v. Commissioner, 88 T.C. at 1008. See also Estate of Newman v. Commissioner, 934 F.2d at 434. *762 Consequently, petitioner is allowed no basis increase because no income was recognized from forgiveness of the CTC mortgage. Gershkowitz v. Commissioner, supra at 1009. Petitioners also claim that they should be allowed a capital loss of $ 241,910, which they claim is petitioner's share of the loss experienced by LCMCA on sale of the medical building to Mr. Schulman. On its 1978 partnership return of income, LCMCA claimed a $ 442,264 ordinary loss on the sale of the building, 51 percent of which, $ 225,555, respondent allowed petitioner as an ordinary loss. Consequently, the loss on the sale of the building has already been taken into account, and petitioners are not entitled to an extra capital loss deduction. Moreover, petitioners have not established that respondent's determination as to the amount of the loss was erroneous. In determining the amount of the capital gain realized by petitioners from LCMCA in 1978, respondent included in petitioner's share of the reduction in partnership liabilities $ 75,000 of the $ 100,000 portion of the sale price for the medical building exceeding the amount of the CTC mortgage outstanding after the *763 partial forgiveness. Petitioners contend that only the reduction in petitioner's share of LCMCA's liabilities effectuated by the forgiveness and discharge of the CTC mortgage, or $ 3,877,514, and a cash distribution of $ 32,640 received from LCMCA should be considered in calculating the gain to be recognized. We find that the basis reduction attributable to the excess payment should be adjusted, but not excluded entirely. First, the $ 100,000 excess payment incorporates the $ 64,000 distributed in cash to the partners, which was shared according to their shares of income and has already been taken into account as a cash distribution reducing basis. Accordingly, it must be subtracted to avoid double counting. Second, the remainder of the excess payment was used to pay outstanding liabilities of LCMCA or expenses connected with the sale of the medical building. To the extent that such payment represents a decrease in petitioner's share of partnership liabilities, petitioner is treated as receiving a cash distribution from the partnership reducing his basis. Sec. 752(b). Respondent has allowed petitioner a basis increase of $ 19,875 on account of such liabilities, and petitioner's *764 basis must be reduced by such amount to take account of such reduction. With respect to the remaining liabilities against which the excess payment was applied, we note that petitioner would have been entitled to a corresponding increase in his basis on account of the remaining liabilities paid with the sales proceeds, which respondent has not allowed. La Rue v. Commissioner, 90 T.C. 465, 478-479 (1988). If petitioner's basis is to be reduced by the liability decrease occasioned by the application of the excess payment to such liabilities, he would have been entitled to an offsetting basis increase for his share of such liabilities, which washes out any change resulting from the basis reduction. Furthermore, that to the extent that a portion of the sales proceeds was used to pay expenses incident to the sale, the amount realized by LCMCA on the sale should be reduced by the amount so used. Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 586 n.86 (1980), and cases cited therein. Consequently, the excess payment is to be taken into account only to the extent of the basis increase allowed by respondent *765 on account of liabilities paid with such payment, or $ 19,875. On their 1978 return, petitioners claimed an ordinary loss of $ 580,805, asserting that an abandonment of their interest in LCMCA had occurred. Although their petition alleged respondent erred in disallowing such deduction, petitioners do not maintain they are entitled to such deduction in their brief. Accordingly, we deem the issue conceded. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Rybak v. Commissioner, 91 T.C. 524, 566 (1988). We note, moreover, that petitioners have not established that an abandonment of their interest in LCMCA occurred, or that the loss equaled the amount claimed. Petitioners have not shown that they intended to abandon their interest in LCMCA, nor is there evidence of an act of abandonment. Citron v. Commissioner, 97 T.C. 200, 208-209 (1991); Pallan v. Commissioner, T.C. Memo. 1986-76. The transactions leading to the dissolution of LCMCA are governed by section 731(a), and so gain or loss resulting therefrom is capital in nature. La Rue v. Commissioner, 90 T.C. 465, 482-487 (1988); *766 Pietz v. Commissioner, 59 T.C. 207 (1972); Tapper v. Commissioner, T.C. Memo. 1986-597. Moreover, after the transactions disposing of the medical building and the discharge of the CTC mortgage, petitioners' basis in their LCMCA interest was zero, so no amount of allowable loss exists. Loss on Disposition of Partnership Interest in AFIL
Petitioners originally claimed a business bad debt loss of $ 80,095 for 1978 with respect to AFIL, reflecting advances made to the partnership by petitioner which he never recovered. Respondent recharacterized such amount as a capital contribution, and allowed such amount as a capital loss offsetting capital gain recognized on dissolution of AFIL after the sale of its building, netting a capital loss of $ 48,057. Petitioners concede the correctness of respondent's recharacterization of the $ 80,095 as a capital loss. Respondent's determination as to the amount of capital loss recognized is accordingly sustained. 1977 Net Operating Loss Carryforward of Mrs. Babin
Respondent disallowed $ 32,357 of 1977 net operating losses which petitioner Betty Boehm Babin sought to carry *767 forward to 1978. Petitioners argue that they are entitled to claim such carryforwards, but the only evidence they adduce is Mrs. Babin's 1977 income tax return. At trial, petitioner Betty Boehm Babin did not testify as to such losses. A tax return, however, is merely a statement of the taxpayer's claim and does not establish the truth of the matters set forth therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Halle v. Commissioner, 7 T.C. 245, 247-248 (1946), affd. 175 F.2d 500 (2d Cir. 1949). Petitioners accordingly have not presented sufficient evidence to establish their entitlement to the carryforwards. To reflect the foregoing, Decision will be entered under Rule 155. Appendix C. STEPHEN BABIN BALANCE SHEET AS OF 1/9/78 (immediately after Cleveland Trust debt forgiveness)
ASSETS
1.
Cash
$ -0-  2.
Stock Holdings
a. Marwood, Inc. (100%)
6,662
b. 14701 Detroit Corp. (100%)
-0-
c. Eastates Gas
20,000
3.
Partnership Interests
a. Rockport Palisades Investment
Associates ("RPIA") (78%)    -0-
b. Lakewood Center North
Associates ("LCNA") (20%)    26,687
c. Lakewood Center North Building
Associates ("LCNBA") (8 1/2%)    -0-
d. Associates for Investment In
Lakewood ("AFIL") (40%)    -0-
e. Venture Associates
20,000
f. Tucker Land Co.
-0-
4.
Notes
a. 14701 Detroit Corp. (face
value of $ 746,511)    -0-
b. RPIA (face value of $ 176,601)
-0-
c. AFIL (face value of $ 22,500)
22,500
5.
Account Receivable from LCMCA
32,640
6.
Option Agreement
-0-
7.
Miscellaneous
a. New England Mutual Life
Insurance Policy CSV    -0-
b. Personal Property
-0-
c. Automobiles
i. 1970 Buick    -0-
ii. 1977 Buick Electra    7,000
TOTAL ASSETS
$ 135,489
LIABILITIES AND NET WORTH
1.
Notes Payable
a. Helen L. Fowerbaugh
$ 20,000 b. Nick Laslovich
7,000
c. Continental Bank/ENB
64,800
d. LCNA
42,700
e. Cleveland Trust
($ 1,000,000 nonrecourse)    -0-
2.
Partnership Liabilities as
General Partner of RPIA
311,407
TOTAL LIABILITIES
$ 445,907
NET WORTH
($ 310,418)
*768 Footnotes
1. Petitioners claimed on their 1977 return that the discharge of the CTC mortgage occurred in that year. Respondent determined that the discharge occurred on January 9, 1978, the date the Bankruptcy Court approved the settlement between CTC and LCMCA forgiving $ 2,420,019 of the mortgage on the medical building and the date on which the sale of the medical building to Schulman occurred. Petitioners, on brief, apparently concede that the discharge occurred during 1978. Accordingly, we will treat the forgiveness and discharge as having occurred during 1978.↩
2. In the Bankruptcy Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3411, Congress provided that the insolvency exception is to be applied at the partner level. Sec. 108(d)(6); Gershkowitz v. Commissioner, 88 T.C. 984, 1007-1008↩ (1987). Such enactment, however, applies only to transactions occurring after 1980, and therefore does not apply to the instant case. Bankruptcy Tax Act of 1980, Pub. L. 96-589, sec. 7(a), 94 Stat. 3389.
3. The parties disagree as to petitioner's share of the cancellation of debt income that respondent contends LCMCA realized. Inasmuch as we hold below that petitioner recognizes no such income, we do not reach such issue.↩
4. Generally, a partnership is insolvent when the value of its nonexempt property, together with the value of the separate nonexempt property of its general partners, is less than its debts. See 11 U.S.C. sec. 101(26)(B) (1982); Ohio Rev. Code Ann. sec. 1336.02↩ (Baldwin Supp. 1991).
5. Respondent also contends that Marwood leased from the City of Lakewood certain land adjacent to the INA and Lakewood Center buildings that was used for parking, and held an option to buy such land. Such land, however, was actually leased by the predecessor of 14701 Detroit Corp., which had been known as Marwood, Inc. at the time the lease was signed but which was in fact a different corporation from the one we consider in the instant case. Accordingly, we do not consider such lease among Marwood's assets.↩
6. We note that while the statements in petitioners' tax returns do not establish the fact that the interest payments were actually made, Wilkinson v. Commissioner, 71 T.C. 633, 639↩ (1979), the claim of interest deductions provides some corroboration of Mr. Babin's testimony as to the existence of such debts.