ESTATE OF Michael NEWMAN, Deceased, Sidney Newman, Executor, and Alice Newman, Executor; and Alice Newman, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 1277, Docket 90–4139.

United States Court of Appeals, Second Circuit.

Argued April 4, 1991.

Decided May 29, 1991.

whether the partnership has realized income must be resolved at the partnership, rather than the limited partner, level. However, the insolvency exception is not an exemption from taxation justifying an upward adjustment of appellants' basis in the partnership.

Steven Kamerman, New York City, for petitioners-appellants.

Charles Bricken (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee.

Before LUMBARD, WINTER and MINER, Circuit Judges.

WINTER, Circuit Judge:

A discharge of indebtedness for less than its face value is usually regarded as an economic benefit to the debtor and is, therefore, taxed as ordinary income. However, confusion as to the theoretical basis for taxing discharges of indebtedness has spawned an illogical, judge-made "insolvency exception" to the general rule. This exception allows a taxpayer who is insolvent to exclude from gross income the amount of forgiven debt except to the extent the forgiveness renders the taxpayer solvent.

The instant appeal presents the question of whether the insolvency exception applies to an insolvent investment partnership whose limited partners are solvent. Applying the Internal Revenue Code of 1954 as amended and effective in 1977,[1] the Tax Court held that the insolvency exception applies at the limited partner rather than partnership level. We disagree. A partnership's gross income is calculated at the partnership level and passed through to individual partners. Any question as to

## BACKGROUND

In 1981 and 1982, the Commissioner of Internal Revenue ("Commissioner") sent statutory notices of deficiency to at least two limited partners in each of four investment partnerships. One of these partnerships was Digitax of Michigan ("Partnership"), in which appellants were limited partners. Appellants were not among those to whom these notices of deficiency were sent. The notices concerned income tax allegedly owed by limited partners for the year 1977 on account of discharges of partnership indebtedness occurring that year. At least one limited partner in each partnership filed a timely petition with the Tax Court for a redetermination of the claimed deficiency, and the cases were consolidated for trial. In an opinion reported as *Gershkowitz v. Commissioner*, 88 T.C. 984 (1987), the Tax Court upheld the Commissioner's claim of deficiency. Two taxpayers appealed, but their appeal was dismissed pursuant to a settlement.

On February 2, 1989, the Commissioner, relying on the Tax Court's findings and conclusions in *Gershkowitz*, sent a statutory notice to the Estate of Michael Newman, deceased, for which Sidney Newman and Alice Newman serve as executors, and to Alice Newman, individually, determining a deficiency of $109,230 in the income tax of Michael Newman, deceased, and Alice Newman, his widow, for the tax year 1977. Both the amount of the claimed deficiency and the theory of liability on which it rest-

1. In 1980, Congress enacted new rules under which debt discharge income is excluded from gross income and applied as an offset against the taxpayer's various tax attributes if the discharge occurs in a bankruptcy proceeding or the taxpayer is insolvent. *See* 26 U.S.C. § 108(a)(1), (b)(1) (1988); 1 Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts,* ¶ 6.4.6 (2d ed. 1989). These rules, which supersede earlier rules developed by the courts, *see* 26 U.S.C. § 108(e)(1) (1988), are applied "at the partner level." *Id.* § 108(d)(6). The events leading to the instant dispute occurred before the enactment of these provisions.

ed were based on the Tax Court's analysis in *Gershkowitz*.

On March 6, 1989, the Newmans filed a timely petition in the Tax Court for a redetermination of their tax liability for the year 1977. Based on a stipulated factual record, the Tax Court upheld the Commissioner's determination of deficiency, relying on the analysis set forth in *Gershkowitz*. See *Estate of Newman v. Commissioner*, 59 T.C.M. (CCH) 543 (1990).

## A. The Partnership's History

In 1972, the four partnerships involved in the *Gershkowitz* decision were established to provide computerized tax return preparation services within specified geographical territories. Although all of the partnerships raised capital for this enterprise through the sale of limited partnerships, the only partnership relevant to the instant action is Digitax of Michigan, in which the Newmans were limited partners. The sole general partner was Tax Management Corporation, now known as Vanguard Ventures, Inc. ("Vanguard").

On November 8, 1972, the Partnership purchased computerized tax preparation systems and programs from Digitax Associates for $200,000, of which $6,667 was paid in cash. The balance of $193,333 was to be paid in five annual installments pursuant to a nonrecourse note. The collateral was the tax preparation systems and programs themselves. Although repayment terms were renegotiated in 1975, the Partnership met its obligation under the note for each of the first four years. Thereafter, on August 29, 1977, the Partnership conveyed the collateral to Digitax, Inc., which had absorbed Digitax Associates, in exchange for cancellation of the unpaid principal and interest due under the note. In *Gershkowitz*, the Tax Court held that this transaction constituted a sale or exchange for tax purposes and that, as a result, the Partnership had realized a gain under 26 U.S.C. § 1245 [2] of $20,000, the amount by which the discharged debt exceeded the Partnership's adjusted basis in the Digitax systems and programs. The Newmans do not challenge this portion of *Gershkowitz*'s analysis.

On April 15, 1973, the Partnership purchased computerized estate planning, asset management and financial planning systems and programs from COAP Computer Programming, Inc. The total purchase price was $100,000, of which $20,000 was paid in cash. The balance was to be paid in four annual installments pursuant to a nonrecourse note. The collateral for the note was the systems and programs themselves. The installment due in 1974 was paid pursuant to the note's terms, but in 1975 the note was amended to allow the remaining installments to fall due in 1977, 1978, and 1979. Subsequently, on August 29, 1977, the Partnership reached an agreement with COAP Planning, Inc., the new corporate name of COAP Computer Programming, pursuant to which the Partnership returned the collateral in exchange for cancellation of the note. In *Gershkowitz*, the Tax Court again treated this agreement as a sale or exchange for tax purposes in which the Partnership realized a Section 1245 gain of $35,000, the amount by which the discharged debt exceeded the Partnership's adjusted basis in the surrendered collateral. The Newmans also do not challenge this portion of *Gershkowitz*'s analysis.

The Tax Court made one further ruling to which the Newmans take no exception. As general partner, Vanguard loaned some $10,500 to the Partnership on a nonrecourse basis at various times prior to January 1, 1977. These loans, due on demand, were discharged in exchange for the Partnership's relinquishment of shares of common stock in a company known as COAP Systems, Inc., the parent entity of Digitax, Inc. and COAP Planning.[3] However, be-

---

**2.** Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954 (26 U.S.C.) as amended and effective in 1977. *See supra* note 1. The Code has since been redesignated as the Internal Revenue Code of 1986.

See Tax Reform Act of 1986, Pub.L.No. 99–514, § 2, 100 Stat. 2085, 2095.

**3.** A complex web of relationships connected the parties to all of these transactions. When the Partnership was formed, Vanguard, through its principal owner, Carl G. Paffendorf, contributed

cause the Partnership's adjusted basis exceeded the amount of discharged indebtedness, the Tax Court ruled that the Partnership had realized a capital loss of $36,777 on the exchange. Not surprisingly, the Newmans agree.

### B. *The Prentice–Hall and COAP Systems Transactions*

The instant litigation was commenced solely to challenge deficiency determinations arising from the cancellation of Partnership indebtedness to two other creditors, Prentice–Hall, Inc. and COAP Systems.

On November 8, 1972, Prentice–Hall made a $50,000 nonrecourse loan to the Partnership. Due on November 30, 1977 and bearing an interest rate of 7 percent, the loan was secured by 40,000 shares of common stock in COAP Systems that the Partnership had acquired as a capital contribution. *See supra* note 3. In addition, Prentice–Hall took a security interest in the Digitax computer programs subordinate to Digitax Associate's security interest.

Prentice–Hall thereafter made two additional nonrecourse loans to the Partnership, each in the amount of $100,000. The first, which bore a 7 percent interest rate and fell due on June 30, 1978, was secured by a subordinate interest in the COAP Planning computer systems and programs. The second, which bore an 8 percent interest rate and fell due on June 30, 1979, was secured by the Partnership's accounts receivable.[4]

On June 20, 1977, before any of the Prentice–Hall notes were due, the Partnership reached an agreement under which all three notes were cancelled following a payment by the Partnership of $40,000. At that time, the Partnership was insolvent and had no accounts receivable. The remaining collateral for the notes was also nearly worthless. Although the tax consequences of this discharge are in dispute, the economic reality was that $250,000 in indebtedness was cancelled in exchange for a $40,000 payment, a $210,000 benefit to the Partnership.

A similar discharge of indebtedness occurred with respect to a series of loans made by COAP Systems. These loans, also nonrecourse, totalled $235,717 and were secured by subordinated security interests in the 40,000 shares of COAP Systems stock, the Digitax and COAP Planning computer systems and programs, and the Partnership's accounts receivable. On August 29, 1977, when the Partnership was insolvent, the COAP Systems notes were cancelled without any payment or return of collateral.

### C. *The Tax Court Decision*

With respect to Prentice–Hall's discharge of indebtedness, the Tax Court, relying on *Gershkowitz,* held that the discharge resulted in ordinary income to the Partnership under Section 61(a)(12) of the Code, which in turn passed through to the partners under Section 702(a). The Tax Court rejected the Newmans' contention that the stipulated insolvency of the Partnership precluded such realization of income and found that the amount of income realized on the transaction was $210,000, *i.e.,* the discharged indebtedness less $40,000 paid for the discharge.

With respect to the COAP Systems discharge of indebtedness, the Tax Court concluded that, despite the overlapping owner-

to the Partnership 38,000 shares of common stock (each with a par value of $.01) in COAP Systems. In exchange, Vanguard received a 19 percent interest in the Partnership. The initial limited partner then contributed another 2,000 shares of COAP Systems common stock in exchange for a 1 percent interest in the Partnership. These were the 40,000 COAP Systems shares that the Partnership later surrendered in exchange for Vanguard's discharge of its indebtedness. In addition, Paffendorf individually retained a 16 percent common stock interest in COAP Systems. Prentice–Hall, Inc., the lender in one of the two transactions at issue in the instant appeal, owned a 15 percent common stock and 49 percent preferred stock interest in COAP Systems. Both Digitax, Inc. and COAP Planning were wholly owned subsidiaries of COAP Systems.

4. These accounts receivable also were designated as security for the two earlier loans made by Prentice–Hall.

ship interests of the parties, *see supra* note 3, the discharges of Partnership indebtedness to COAP Systems, Digitax, Inc., and COAP Planning were discrete transactions with separate tax consequences. Consequently, even though the court treated the Digitax and COAP Planning transactions as sales of collateral, it held that the entire amount of the COAP Systems discharge, $235,717, was ordinary income.

Because these discharges were treated as ordinary income to the Partnership, the Tax Court allowed the Newmans to adjust their basis in the Partnership upward in the amount of income attributable to them.[5] *See* 26 U.S.C. § 705(a)(1)(A). This adjustment protected them from double taxation, *i.e.*, income tax under Section 61(a)(12) followed by a capital gains tax on the same amount.

## DISCUSSION

On appeal, the Newmans argue that the Prentice–Hall and COAP Systems transactions did not result in ordinary income to the Partnership because the Partnership was insolvent both before and after these transactions. Appellants also contend that their basis in the Partnership should nevertheless be adjusted upward by the amount of the Prentice–Hall and COAP Systems discharges to ensure that they are not taxed in the form of capital gain on income previously treated under the insolvency exception as tax exempt. For the reasons stated below, we agree with the former position but reject the latter.

### A. The Insolvency Exception

A discharge of indebtedness for less than the face amount of the debt conveys an economic benefit that is functionally equivalent to income. Ordinarily, therefore, that benefit is included in a taxpayer's gross income for purposes of taxation. In *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931), a corporation issued bonds on the open market and repurchased them later the same year at a

discount. The Supreme Court held that the difference between the face amount of the bonds and the repurchase price was taxable as ordinary income, explaining:

> As a result of its dealings [the corporation] made available $137,521.30 [of] assets previously offset by the obligation of bonds now extinct.... [The corporation] has realized within the year an accession to income, if we take words in their plain popular meaning, as they should be taken here.

*Id.* at 3, 52 S.Ct. at 4. In 1954, Congress expressly included "[i]ncome from discharge of indebtedness" in the statutory definition of gross income, 26 U.S.C. § 61(a)(12), leaving the courts to devise appropriate glosses or exceptions to this general rule. *See* 1 Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts*, ¶ 6.4.1, p. 6–33 (2d ed. 1989) [hereinafter Bittker & Lokken].

Among these judicially created exceptions to Section 61(a)(12) is the insolvency exception. *See Fifth Ave.–Fourteenth St. Corp. v. Commissioner*, 147 F.2d 453, 457 (2d Cir.1945); *Dallas Transfer & Terminal Warehouse Co. v. Commissioner*, 70 F.2d 95, 96 (5th Cir.1934); Mertens, *Law of Federal Income Taxation*, § 11.42 (rev. 1990).

> The theory of this exception is that no accession to income has occurred if after the debt cancellation, the taxpayer remains insolvent since no assets have been freed. To the extent the cancellation renders the taxpayer solvent, however, he is deemed to have realized income in the amount by which his assets exceed his liabilities immediately after the cancellation.

*Estate of Delman v. Commissioner*, 73 T.C. 15, 32 (1979) (citations omitted).

The logic of the insolvency exception is not obvious. Cash income to an insolvent debtor is taxable even if the debtor remains insolvent and the cash is used solely to discharge part of the debt. Moreover, the discharge of a debt for less than its face amount is taxable income to the debtor

---

**5.** As of January 1, 1977, the Newmans' capital account in the Partnership had a negative balance of $159,610. Having made a $100,000 capital contribution, they owned a 37.62 percent interest in the Partnership, the adjusted basis of which was $54,655.

because the borrowed funds were excluded from debtor's gross income when first received. As the Supreme Court recently explained:

> Borrowed funds are excluded from income in the first instance because the taxpayer's obligation to repay the funds offsets any increase in the taxpayer's assets; if the taxpayer is thereafter released from his obligation to repay, the taxpayer enjoys a net increase in assets equal to the forgiven portion of the debt, and the basis for the original exclusion thus evaporates.

*United States v. Centennial Savings Bank FSB*, —— U.S. ——, 111 S.Ct. 1512, 1518, 113 L.Ed.2d 608 (1991). Indeed, Section 61(a)(12) applies to the discharge of a nonrecourse loan as well, precisely because "[t]he crucial facts—that the debtor excludes the borrowed funds from income when received and ultimately pays less than the excluded amount—are the same whether or not he has personal liability." 1 Bittker & Lokken, ¶ 6.4.2, p. 6–36.

The timing of the *Kirby Lumber* decision may have generated a reluctance to follow its logic in cases involving insolvent debtors. It was decided during the Great Depression, a period of widespread debt discharge and insolvency. *Dallas Transfer* established the insolvency exception three years later, mitigating the harsh effect of *Kirby Lumber* on insolvent debtors. As one estimable text states,

> [I]f the creditor accepts less than the amount due because the debtor is in financial distress, taxing the debtor might have seemed anomalous, even heartless, especially since the closer the debtor approaches to the abyss of bankruptcy, the greater the discount on his obligations and, therefore, the heavier the tax burden if the discount is taxed.

*Id.* at ¶ 6.4.1, pp. 6–26 to 6–27.

A reluctance "to kick someone when he is down" probably does not fully explain the development of the insolvency exception, however. *Id.* at ¶ 6.4.1, p. 6–27. Equally important were misapprehensions as to the reasons for taxing discharges of indebtedness stemming from *Bowers v. Kerbaugh–Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926), and *Kirby Lumber* itself. In *Kerbaugh–Empire*, a corporation borrowed German marks before World War I, converted them into dollars, and advanced the dollars to its subsidiary. The subsidiary lost the money in failed business ventures, and the parent corporation repaid the loans shortly after the war in devalued marks that cost some $685,000 less than the value of the loan in pre-war marks. Employing questionable reasoning, the Supreme Court held that the corporation had no taxable gain on the loan repayment because "the whole transaction"—the borrowing and subsequent use of the money—"was a loss." 271 U.S. at 175, 46 S.Ct. at 451. The Court concluded that "[t]he loss [from the subsidiary's venture] was less than it would have been if marks had not declined in value; but the mere diminution of loss is not gain, profit or income." *Id.*

After *Kerbaugh–Empire*, the government had little alternative but to argue in *Kirby Lumber* that a different result should follow where the taxpayer could not establish overall loss. Although this argument flowed from the dubious notion of "overall loss," it was a winner. The Court held in *Kirby Lumber* that the corporation's repurchase of bonds for less than their face amount resulted in taxable income to the corporation because it "made available ... assets previously offset by the obligation of bonds." 284 U.S. at 3, 52 S.Ct. at 4. The Court thus suggested that the freeing of assets incident to the cancellation of indebtedness, rather than the cancellation itself, provided the basis for taxing the forgiven debt.

These decisions thus relied upon largely irrelevant aspects of the particular commercial transactions to determine whether the discharge of indebtedness in question was subject to taxation. Because money is fungible, identifying the use of borrowed funds, as contemplated by *Kerbaugh–Empire*, is virtually impossible. If the tax consequences of borrowing were to depend on the use to which the borrowed funds were put, chaos would follow, and the ob-

tuseness that now pervades the law of taxation would soon be regarded as a Golden Era of clarity and simplicity. *See* 1 Bittker & Lokken, ¶ 6.4.1, pp. 6–28 to 6–29. Nor is the freeing of encumbered assets, as discussed in *Kirby Lumber*, a useful conception of taxable gain. As noted above, cash income to an insolvent debtor is taxable even though the debtor remains insolvent after using the cash to reduce the burden of debt and even though assets are no more freed in that case than in the case of forgiveness of a portion of an insolvent debtor's debt. As also noted above, the proceeds from borrowed funds are excluded from gross income when received because they are offset by the obligation to repay. If the taxpayer is relieved from the obligation, there is no longer a basis for the original exclusion.

Given the discredited rationales of *Kerbaugh–Empire* and *Kirby Lumber*, it is no surprise that they have left as their heritage the similarly flawed insolvency exception. Drawing heavily on the concepts of taxpayer loss and encumbered assets, the exception subjects to taxation only the portion of cancelled debt that renders a previously insolvent debtor solvent. *See Estate of Delman*, 73 T.C. at 32. As in *Kirby Lumber*, therefore, taxable gain from a cancelled debt turns not on whether borrowed funds were excluded from gross income when received but on the value of the debtor's remaining assets—a dubious standard, to say the least.

Nevertheless, the Commissioner, not without understandable complaint, *see* Brief of Appellee at 28–29, concedes to history and to the Newmans the existence of an insolvency exception and disputes only its effect in the instant case. Accordingly, despite our own reservations, we turn to the question of whether this illogical exception should logically be applied to an insolvent partnership.

## B. *Applying the Insolvency Exception*

■ At the time that Prentice–Hall and COAP Systems discharged the Partnership's debt, the Newmans were solvent but the Partnership was not. The question is thus at which level, partnership or limited partner, the insolvency exception applies. The Tax Court held that it applies, if at all, at the limited partner level. We disagree.

The leading decision on federal tax treatment of partnerships is *United States v. Basye*, 410 U.S. 441, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973). In that case, the Supreme Court held that retirement benefits made directly to a trust set up by a medical partnership should be treated as income to the partners, notwithstanding the fact that the partners' eventual receipt of the benefits was uncertain. Because payments to the trust were made by the partnership's employer in exchange for professional services, the Court held that the payments were partnership income for which the partners bore individual tax liability. Observing that "partnerships are entities for purposes of calculating and filing informational returns but … [otherwise] are conduits through which the taxpaying obligation passes to the individual partners in accord with their distributive shares," *id.* at 448 n. 8, 93 S.Ct. at 1085 n. 8, the Court concluded that "each partner must pay taxes on his distributive share of the partnership's income without regard to whether that amount is actually distributed to him," *id.* at 453, 93 S.Ct. at 1088.

*Basye*'s conception of the partnership as both entity and conduit is instructive with respect to the instant appeal. Subchapter K of Title 26 reflects precisely this hybrid approach to the taxation of partnership income. Section 703(a), for example, refers to "[t]he taxable income of a partnership" and sets forth specific rules for calculating such income, whereas Section 702(a)(8) provides that "each partner shall take into account separately his distributive share of the partnership's … taxable income or loss." Yet the two provisions are not in conflict, because the calculation of income at the partnership level is nothing more than

a method of centralizing a host of decisions that must be made uniformly for all partners, such as whether particular items received by the partnership consti-

tute income or the return of capital, whether expenditures qualify as ordinary or necessary expenses of conducting the firm's business, and so on. In effect, the partnership is treated as an entity in analyzing the financial results of its operations, since these ingredients determine the chemical composition of the liquid that is channeled through the partnership to the partners.

3 Bittker & Lokken ¶ 86.1.1 (2d ed. 1991). Income is calculated at the partnership level to ensure that various elections pertaining to the computation of income (*e.g.*, depreciation methods) are made at that level. *Id.* at ¶ 85.1.4. At the same time, the amount of tax owed by each partner continues to depend on calculations at the individual level (*e.g.*, personal exemptions, deductions) and thus varies even among partners with equal distributive shares. In this way, some decisions are standardized throughout the partnership while others are tailored to the circumstances of individual partners. *See Siben v. Commissioner*, 930 F.2d 1034, 1037 (2d Cir.1991) ("[T]he partnership return does not furnish information necessary to calculate the individual partner's income tax, such as marital status, exemptions, and income, losses, deductions or credits derived from sources other than the partnership.").

Given this statutory scheme, the insolvency exception should have been applied at the partnership, rather than limited partner, level. If, as in *Basye*, partners are liable for their distributive shares of partnership income without regard to whether they have actually received such income, then consistency would seem to dictate that an exception to the realization of income also be applied at the partnership level. *Basye* held that, for the limited purpose of calculating the amount of income received by a partnership, the partnership must be regarded as a separate economic entity that earns income and sustains losses as a result of its commercial activities. 410 U.S. at 448, 93 S.Ct. at 1085. Thus, if a partnership earns income, the income is taxable to the partners without regard to their actual receipt of it; if it incurs losses, the partners are entitled to deduct their distributive share of the losses; and if it is insolvent (which, by definition, means that, taking into account the personal liability of general partners for partnership debts, its general partners are also insolvent), it may claim the benefit of the insolvency exception when it calculates its income. In short, because Subchapter K evinces an intention to centralize decisions regarding the calculation of partnership income at the partnership level, the Tax Court erred when it declined to apply the insolvency exception at that level.

Our conclusion is supported by the Fifth Circuit's decision in *Stackhouse v. United States*, 441 F.2d 465 (5th Cir.1971), in which the court held that the discharge of an insolvent partnership's indebtedness constituted a capital distribution under 26 U.S.C. § 752. Although in *Gershkowitz* the Tax Court sought to distinguish *Stackhouse* on the ground that it had failed to consider that the cancelled indebtedness might be ordinary income, this is simply not true. In *Stackhouse*, the Commissioner specifically argued that "§ 61(a)(12) controls ... [and] that the partnership provisions of Subchapter K are inapplicable." *Id.* at 468. Only after rejecting that position, quite probably on the ground that the insolvency exception barred resort to Section 61(a)(12), did the court proceed to consider whether the cancelled debt constituted a capital distribution under Section 752. As a result, the analysis in *Stackhouse* is entirely consistent with the view that the insolvency exception applies to insolvent partnerships.

## C. *The Upward Adjustment of Basis*

■ Having decided that the Partnership realized no income as a result of the Prentice–Hall and COAP Systems discharges, we turn to the question of whether appellants are entitled to increase the basis of their interest in the Partnership by the amount of their distributive shares of the discharged indebtedness.

The Tax Court held that the Partnership had realized discharge of indebtedness income under Section 61(a)(12) and that, as a result, appellants were entitled to a stepped-up basis under Section 705(a)(1)(A)

to protect them from double taxation, *i.e.*, income tax under Section 61(a)(12) followed by a capital gains tax on the same amount. Now, having prevailed on their assertion of the insolvency exception, appellants argue that they are nevertheless entitled to the stepped-up basis on the ground that they have an "exemption" from taxation on their distributive share of the discharged indebtedness.

Under Section 705(a)(1)(B), a taxpayer's basis may be increased by the amount of his distributive share of "income of the partnership exempt from tax under this title." Appellants thus argue that, by virtue of the insolvency exception, they are entitled to an increase in basis, and that only such an increase in basis will permit them to preserve the economic benefit of their exemption. We disagree.

The insolvency exception is a judicially fashioned rule aimed at mitigating the harsh effect of taxing insolvent debtors on the cancellation of debt. It is based on an equitable notion of forgiveness applicable only to insolvent debtors and hardly constitutes a statutory or constitutional exemption for certain kinds of income. It can hardly be applied, therefore, in a way that creates a windfall for a solvent limited partner, by enabling the partner to enjoy both the benefits of the insolvency exception and increased deductions for capital losses. Accordingly, we decline to adjust appellants' basis in the Partnership pursuant to Section 705(a)(1)(B).

## CONCLUSION

We reverse the decision of the Tax Court on the ground that the insolvency exception applies at the partnership, rather than limited partner, level. However, because we deny the upward adjustment in basis, we remand to determine the amount, if any, of outstanding tax liabilities.