T.C. Memo. 1996-283

UNITED STATES TAX COURT

PARKER PROPERTIES JOINT VENTURE, PDW&A, INC., A PARTNER
OTHER THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

TWENTY MILE JOINT VENTURE, PND, LTD., TAX MATTERS
PARTNER, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 18386-92, 18387-92.[1]    Filed June 19, 1996.

<u>Theodore Z. Gelt</u> and <u>Ellen O'Brien Kauffmann</u>, for
petitioners.

<u>Theodore Z. Gelt</u>, for the intervenor, Nicholson Enterprises,
Inc., the tax matters partner, in docket No. 18386-92 only.

<u>Frederick J. Lockhart, Jr.</u>, for respondent.

_____

[1] These cases were consolidated for purposes of trial,
briefing, and opinion.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent, for the taxable year ended
June 28, 1988, mailed separate notices of final partnership
administrative adjustment to the tax matters partners of Parker
Properties Joint Venture (Parker Properties) and Twenty Mile
Joint Venture (Twenty Mile).  In these notices, respondent
increased Parker Properties' and Twenty Mile's incomes by
unreported cancellation of indebtedness income of $3,419,963 and
$1,395,492, respectively.

The issues remaining for our consideration are:  (1) Whether
the partnerships realized income from cancellation of
indebtedness; and, if so, (2) the amount of such income.

All section references are to the Internal Revenue Code in
effect for the year in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

FINDINGS OF FACT[2]

## Background

At the time the petitions were filed, Parker Properties' and
Twenty Mile's principal places of business were in Parker,
Colorado.[3]

---

[2] The stipulations of fact and the exhibits are incorporated
by this reference.

[3] The petition of Philip D. Winn & Associates, Inc. (PDW&A),
(continued...)

These cases concern real estate investments of R. James Nicholson (Mr. Nicholson), Philip D. Winn (Mr. Winn), and David A. Gitlitz (Mr. Gitlitz), and several related entities, during the late 1980's. Empire Savings, Building & Loan Association (Empire), a Colorado savings and loan association, participated directly as the lender of funds to purchase the realty and indirectly through its wholly owned subsidiary, E.S.L. Corp. (ESL), as an investor in the investing entities.[4]

Parker Properties and Twenty Mile are partnerships formed, at Empire's suggestion, for the purposes of acquiring, developing, and selling the real estate under consideration. Both entities were accrual method taxpayers during the relevant years.

---

[3](...continued)
a notice partner of Parker Properties Joint Venture (Parker Properties) for the year at issue, was filed in docket No. 18386-92. Sec. 6226(b)(1). The tax matters partner of Parker Properties, Nicholson Enterprises, Inc. (Nicholson Enterprises), did not cause a petition for readjustment of partnership items to be filed within the period specified by sec. 6226(a). However, Nicholson Enterprises timely elected to intervene in docket No. 18386-92 in accordance with sec. 6226(b) and Rule 245(a). PND, Ltd. (PND), is both the notice partner and tax matters partner of Twenty Mile Joint Venture (Twenty Mile) for the year at issue, and its petition was filed in docket No. 18387-92.

[4] Empire's equity investment was made based on the understanding that it was permitted by thrift industry regulations. It was also understood that industry regulations required that this type of investment be made through a subsidiary.

Parker Properties

Parker Properties was formed in August 1983 by Nicholson Enterprises, Inc. (Nicholson Enterprises), Philip D. Winn & Associates, Inc. (PDW&A), and ESL. Nicholson Enterprises and PDW&A each received a 25-percent interest in Parker Properties, and ESL received a 50-percent interest. Parker Properties' initial capital contributions were as follows: PDW&A, $500; Nicholson Enterprises, $500; and ESL, $1,000. There were few, if any, additional capital contributions made by the partners over the life of Parker Properties.

Parker Properties obtained financing from Empire for the acquisition of real estate from Bankers Trust (the Bankers Trust property). Empire lent $10 million to Parker Properties to acquire the Bankers Trust property and an additional $2 million for property improvement and operating expenses. The loan was evidenced by a $12 million promissory note dated August 30, 1983, payable to Empire. This note was signed by officers of the joint venturers ESL, Nicholson Enterprises, and PDW&A; and by Messrs. Gitlitz, Nicholson, and Winn, individually. The $12 million note was secured by the Bankers Trust property without recourse to Parker Properties but with recourse to Mr. Nicholson as to 12.5 percent of the loan balance, and Messrs. Winn and Gitlitz each as to 6.25 percent of the loan balance. Parker Properties claimed

interest expense deductions on the debt to Empire and Commercial.[5]

Twenty Mile

During 1985, after success in the development of the Bankers Trust property, the Parker Properties investors acquired another parcel (the Clarke property) in or near the town of Parker. The investors used Twenty Mile as the joint venture partnership for acquisition of the Clarke property. The joint venture agreement was completed on April 16, 1985, by and between PND and ESL, each receiving a 50-percent interest in Twenty Mile. PDW&A and Nicholson Enterprises were the general partners of PND.[6] The initial capital contributions from the Twenty Mile partners were as follows: PND, $1,000; ESL, $1,000. Similar to the situation with Parker Properties, there were few, if any, additional

---

[5] In addition to the loans from Empire, funding was obtained through the issuance of tax free metropolitan district bonds. Metropolitan districts are quasi-municipal entities that can issue tax free debt. Such districts have been utilized to provide utility enhancements in the absence of a true municipality or in the presence of a municipality incapable of issuing debt.
  Parker Properties also assumed an obligation of Bankers Trust to purchase water and sewer taps as secured by a letter of credit issued by Empire. The obligation was subject to annual tax liability to support the retirement of bonds for improving and widening certain streets in the town of Parker.

[6] Twenty Mile also had two additional limited partners, each with small interests: The seller of the Clarke property and a real estate broker.

capital contributions made by the partners over the life of Twenty Mile.

Empire lent Twenty Mile $3,500,000 (with a maximum limit of $6 million) for acquisition and development of the Clarke property. The loan was evidenced by a $6 million promissory note dated April 16, 1985, from Twenty Mile to Empire, and signed by an officer of ESL and by officers of Nicholson Enterprises and PDW&A as the general partners of PND, and Messrs. Gitlitz, Nicholson, and Winn, individually. The debt was secured by the Clarke property, without recourse to Twenty Mile, but with recourse to the three individuals in the same percentages used for Parker Properties.

Parker 480 Joint Venture

A third parcel was acquired by Parker 480 Joint Venture (Parker 480) (which is not a party in this case). The Parker 480 agreement was entered into on June 26, 1985, by and between A. & P.D.W. Limited Partnership (APDW), consisting of the PDW&A partners; and N-4 Associates (N-4), which included Mr. Nicholson and his family.

Parker 480 partners contributed capital, as follows: APDW, $500; N-4, $500. Empire was the lender with an "equity incentive participation" or "equity kicker".[7]

_____

[7] The "equity kicker" is defined in the $3,500,000 note as 50 percent of the equity in the property secured by the deed of
(continued...)

The $3,500,000 Empire lent to Parker, was evidenced by a June 26, 1985, promissory note, which was subscribed to by Parker 480 and Messrs. Gitlitz, Nicholson, and Winn, individually.  The note was nonrecourse as to Parker 480, and recourse as to the individuals in Parker Properties and Twenty Mile.

The Agreement in Controversy

On April 30, 1987, Commercial Federal Savings & Loan Association (Commercial) acquired Empire and ESL from its holding company, Baldwin United Corp., which was then in a chapter 11 bankruptcy proceeding.  Accordingly, Commercial was the successor in interest to Empire's loans and involvement in the subject partnerships.  Due to a declining real estate market, Commercial did not want to be associated with the joint ventures through ESL or extend any additional credit to the real estate venturers.  It was Commercial's wish to dispose of the debt and equity interests it had in the joint ventures.

Commercial met with Parker Properties and Twenty Mile partners during the summer of 1987.  At that meeting, Commercial expressed its desire to liquidate its positions as a creditor and, through ESL, an investor in Parker Properties and Twenty Mile.  It was Commercial's desire for the partners of Parker

---

[7](...continued)
trust.  "Equity" is described in the same instrument as the net sales proceeds on any portion of the property sold and the deemed net sales proceeds of the remaining property with the deemed sales price determined by an agreed-to appraisal process.

Properties and Twenty Mile to obtain new funding to liquidate Commercial's and its subsidiaries' (Empire and ESL) positions in the joint ventures for as much cash as possible. However, Commercial realized that the collateral real property had declined in value. Consequently, Commercial was willing to accept less than the outstanding balances of the loans in order to liquidate its interests in the ventures.

Acceding to Commercial's wishes, in late 1987, the investing partners negotiated with Sun Savings & Loan Association (Sun Savings) for financing to liquidate Commercial's interests. Although Sun Savings was willing to finance the liquidation of Commercial's interest in the partnerships, the investing partners were not willing to pay the minimum amount of cash that Commercial would accept. To adjust for the shortfall, Commercial suggested that certain of its Denver area apartment mortgages (apartment mortgages) be purchased in connection with the transaction. These negotiations, however, did not result in an agreement.

In March 1988, representatives of the investing partners entered into negotiations with Capitol Federal Savings & Loan Association (Capitol Federal) to arrange for financing to liquidate Commercial's joint ventures interests. In a letter dated April 19, 1988, Commercial made a proposal to Mr. Winn that Commercial liquidate its creditor's position through Empire and

its investor position through ESL.  Commercial's proposal offered that: (1) Commercial would sell all of its interests in Parker Properties and Twenty Mile for $7 million; (2) Commercial would release Messrs. Gitlitz, Nicholson, and Winn from individual liability on the Parker 480 loan; (3) Commercial would sell the apartment mortgages for $12.5 million; (4) Commercial and ESL would be released from all liabilities as a partner, on outstanding letters of credit, and on any other contracts and obligations; and (5) the transaction would be completed no later than May 15, 1988.

On April 21, 1988, representatives of Commercial, ESL, and Capitol Federal met with the investing partners and their attorney to discuss the plans to liquidate Commercial's interests.  One possibility was to replace the Commercial loans with those of another lender.  Another possibility was to include the Parker 480 property in the transaction, perhaps with an increased purchase price.  Capitol Federal would assume the $2 million sewer tap letter of credit, and the investing partners would indemnify Commercial from any known liabilities.  The sale of the $12.5 million apartment mortgage notes was also suggested as a possible condition.

On June 20, 1988, Commercial's attorney faxed a rough draft of the agreement to the investing partners' attorney.  This draft included the following typed language:

WHEREAS, [ESL] is willing to sell its joint venture interest in Parker Properties and Twenty Mile for the sum of $10,000.00 and Commercial is willing to accept the sum of $10,990,000.00 in full settlement and satisfaction of its above-described loan balances, all subject to fulfillment of the terms of this Agreement, and Parker Properties is desirous of purchasing such joint venture interests and paying the outstanding balances of the loans to Commercial as adjusted.

The draft agreement also provided that Parker Properties would pay ESL $10,000 for its interest in Parker Properties and Twenty Mile. In addition, Parker Properties was to pay Commercial $7,990,000 cash and deliver a $3 million promissory note. Handwritten just above the terms of the agreement appeared the following: "WHEREAS Prior closing Commercial will contribute capital to and reduce indebtedness - ESL wholly owned subs".

On June 22, 1988, the investing partners' attorney faxed Commercial and its attorney a followup letter outlining the transaction and referring to "what the borrower would like the transaction to look like." The letter contained the following chart which detailed "how the transaction would result":

|  | Debt | Convert to Equity | Forgive | To be Paid | Note |
|---|---|---|---|---|---|
| Parker Properties | $9,319,963 | $3,419,963 | --- | $2,900,000 | $3,000,000 |
| Twenty Mile | 3,395,492 | 1,395,492 | --- | 2,000,000 | --- |
| Parker 480 | 3,256,910 | --- | $156,910 | 3,100,000 | --- |
| Total | 15,972,365 | 4,815,455 | 156,910 | 8,000,000 | 3,000,000 |

On June 28, 1988, Commercial's accountant was asked to provide his comments "from a tax standpoint." Based on his understanding of the proposed agreement, the accountant opined that:

It is fairly obvious in the agreement that Commercial is forgiving approximately $4.8 million of debt. The equity interest received is worthless and Commercial intends to charge off the portion of the debt so exchanged. The charge off will be taken during the year ending June 30, 1988, and will be listed along with Commercial's other loans charged off.

Ultimately, on the same day, after the tax advice had been sought and received on the proposed transaction, the terms of the draft agreement were integrated into a virtually identical final agreement (the Agreement). The Agreement was reached between Messrs. Gitlitz, Nicholson, and Winn, individually, and PDW&A, Nicholson Enterprises, Parker Properties, Twenty Mile, Parker 480, ESL, and Commercial. The Agreement provided that Commercial was contributing approximately $4.8 million of additional capital through debt reduction to Parker Properties and Twenty Mile on behalf of ESL. However, the terms of the Agreement also provided that ESL would then convey its interests in both Parker Properties and Twenty Mile (which was to include the $4.8 million capital contribution by Commercial) to Nicholson Enterprises and PDW&A for $5,000 each. Parker Properties, Twenty Mile, Parker 480, and their respective partners agreed to indemnify Commercial and ESL from any claims made against them. The transaction was to close on or before June 28, 1988.

Regarding the apartment mortgages, a separate agreement was entered into between Commercial and Riverbank Acquisition

Associates (Riverbank)[8] on June 16, 1988. Riverbank agreed to purchase the apartment mortgages for $12,100,000, which the parties agree was $650,000 in excess of their fair market value.

Approximately 7 months after the closing of the Agreement, Commercial sent Parker Properties and Twenty Mile each a form entitled, "Acquisition or Abandonment of Secured Property" (Form 1099-A), reflecting income from the cancellation of indebtedness in the amounts of $3,419,963 and $1,395,492, respectively. Parker Properties and Twenty Mile each reported these amounts as other income. However, the joint ventures then reported an offsetting "other deduction" on their respective tax returns with the following disclosure: "The partnership received a 1099 * * * described as income from forgiveness of indebtedness. This was not reported as income since it resulted from a contribution to capital rather than from debt relief." Commercial, however, claimed the above-mentioned amounts as an ordinary loss from the cancellation of indebtedness. As a result, Commercial entered into an agreement with the investors which provided that the investors would hold Commercial harmless from any claims that may arise from its issuing the Forms 1099-A.

---

[8] Riverbank was at all relevant times a Colorado general partnership of which Riverbank Denver, Inc., and Residual Acquisition Corp. were general partners. Residual Acquisition Corp. was 100 percent owned by David A. Gitlitz.

On or near May 15, 1990, Commercial filed a Form 1120X, "Amended U.S. Corporation Income Tax Return", for the taxable year ended June 30, 1988, in order to exclude some previously taxed dividends. When respondent examined the claim reported in the amended return, Commercial agreed to include ESL's share of cancellation of indebtedness income attributable to its interests in the joint ventures which had not been included in ESL's tax returns. Finally, Commercial agreed to an ordinary income adjustment to restore ESL's negative capital accounts in the joint venture partnerships to zero, and Commercial was allowed capital loss treatment for the sale of the interests.

## ULTIMATE FINDINGS OF FACT

Parker Properties' and Twenty Mile's agreement with Commercial resulted in cancellation of indebtedness income.

## OPINION

The partnerships obtained financing from Empire. Subsequently, Empire's successor in interest, Commercial, decided to disassociate itself from the partnerships. Commercial and the partners, after negotiations, reached an agreement. Respondent and petitioners disagree as to the effect of the agreement on the partners' Federal income tax.

Respondent determined that Parker Properties and Twenty Mile received $3,419,963 and $1,395,492 in income in 1988 from the cancellation of indebtedness, respectively. Petitioners argue

that the restructuring that they attempted was in form and substance a contribution to capital to each partnership. We must decide whether petitioners realized income from the cancellation of indebtedness. If there was a cancellation of indebtedness resulting in income to petitioners, we must decide the amount recognizable. Petitioners have the burden of showing that respondent's determination is in error and/or that the amounts in controversy were capital contributions. Rule 142(a).

Petitioners assert that the conversion of the loan into a partnership capital interest is a nonrecognition event under section 721. Section 721 provides: "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership." We must decide if the substance of these transactions was the same as the form in which the partnerships attempted to cast it. Section 1.721-1, Income Tax Regs., provides in relevant part: "In all cases, the substance of the transaction will govern, rather than its form." See Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 813 (1988).

Section 61(a)(12) provides that gross income includes "Income from discharge of indebtedness". The parties agree that, before the execution of the Agreement, the items in question were debts of Parker Properties and Twenty Mile owed to Empire and,

later, Commercial.  Petitioners, nonetheless, have attempted to structure the extinguishment of their debt as capital contributions.  Thus, petitioners believe that the form should be respected for Federal tax purposes.

Taxpayers may attempt to structure their transactions in such a way as to lessen their tax burden.  Gregory v. Helvering, 293 U.S. 465 (1935).  Partners may attempt to structure the substance of their transactions by choosing the form of the transactions.  Otey v. Commissioner, 70 T.C. 312 (1978), affd. per curiam 634 F.2d 1046 (6th Cir. 1980).  Ordinarily, "taxpayers are * * * bound by the form of their transaction while the Government can attack that form if it does not represent the substance of the transaction."  Newhall Unitrust v. Commissioner, 104 T.C. 236, 243 (1995).  Petitioners contend that we should respect the form they have chosen which is reflected in the Agreement.  "Whether a debt has been discharged is dependent on the substance of the transactions.  Mere formalisms arranged by the parties are not binding in the application of the tax laws." Cozzi v. Commissioner, 88 T.C. 435, 445 (1987) (citing Commissioner v. Court Holding Co., 324 U.S. 331 (1945)).

Beginning in the summer of 1987, shortly after acquiring Empire, Commercial desired to terminate both its investor and debtor-creditor relationships in the joint ventures.  Commercial requested that the investing partners obtain funding to ensure

that Commercial would be removed from the joint ventures, while receiving as much cash as possible. The agreement terms, however, cast this as a contribution to capital by entities seeking complete financial disassociation from the partnerships.

The April 19, 1988, letter prepared on behalf of Commercial expressed the continuing desire to end its relationship with Parker Properties and Twenty Mile, including its equity involvement through ESL. On April 25, 1988, Commercial's attorney prepared a memorandum to the client's file which detailed the April 21 and 22, 1988, meetings. That memorandum contains mention of Mr. Nicholson negotiating with Sun Savings "for enough funds to take out Empire entirely."

Petitioners maintain that the Agreement provided for a capital contribution in excess of $4.8 million. However, the June 20, 1988, draft of the Agreement indicated that ESL was willing to sell its interests in Parker Properties and Twenty Mile for a mere $10,000. Petitioners counter that this is because Commercial was ultimately relieved of exposure to over $8 million in liabilities, and, thus, there was a valid business purpose.

We find, however, that any such liability relief was a practical consequence of the plan. Commercial wanted out of the joint ventures entirely; it was not seeking to cancel the debt in order to become a new investor. Furthermore, ESL sold its

"interest" for a relatively nominal sum ($10,000) shortly after the questioned transaction.  The substance of this transaction was separation from the joint ventures, and this was inconsistent with a capital contribution.  By issuing Forms 1099-A and reporting income from the cancellation of indebtedness, Commercial and ESL treated the arrangement as a cessation of their interest and cancellation of indebtedness.

The June 20, 1988, draft agreement contains the statement that the parties desired the cancellation of the partnerships' indebtedness.  It was not until 8 days later, i.e., after tax advice was obtained and the final agreement prepared, that any mention of a contribution to capital occurred.  This is illustrative of the plan--Commercial wanted out of its creditor status; any purported capital contribution was a mere provision that was not otherwise in sync with the plan.  Petitioners did not enter into the Agreement to increase or expand their capital structure.  Cf. Perlman v. Commissioner, 27 T.C. 755, 758 (1957), affd. 252 F.2d 890 (2d Cir. 1958).

Commercial's accountant, in his June 28, 1988, memorandum, suggests the true nature of the transaction.  Notwithstanding the fact that tax advice was sought, Commercial's accountant was asked to review the draft agreement, the terms of which were incorporated into the final agreement.  Based on his independent review, the accountant concluded that the draft agreement was

simply a device through which nearly $4.8 million of debt would be forgiven and that any equity interest received by ESL would be worthless. Noting that Commercial intended to write off the portion of debt that would be extinguished, the accountant found that to be consistent with the treatment of other loans that were charged-off for the year ended June 30, 1988.

Having found that the transaction resulted in cancellation of indebtedness income, we must next decide the extent to which petitioners must recognize income. Petitioners argue that, under Fulton Gold Corp. v. Commissioner, 31 B.T.A. 519 (1934), there were no accessions to their wealth because the debt cancellation did not free assets as it would have if the nonrecourse debt had been recourse. However, in Gershkowitz v. Commissioner, 88 T.C. 984, 1010 (1987), this Court held that a reduction in the amount of an undersecured, nonrecourse debt by one who was not the seller of any property securing the debt results in cancellation of indebtedness income. See also Commissioner v. Tufts, 461 U.S. 300, 307 (1983) (nonrecourse mortgage tantamount to a true loan; its forgiveness triggers cancellation of indebtedness income, notwithstanding a lesser fair market value of the collateral than the balance of the debt).

The partnerships' transactions with Commercial arose from debt workouts generated by a depressed real estate market. Parker Properties and Twenty Mile borrowed funds from Empire on a

nonrecourse basis as to the partnerships, secured by the real estate which was the subject of each joint venture. In Commissioner v. Tufts, supra, the collateral for the loan was not retained by the borrowers upon debt cancellation. Petitioners argue that, because they retained their collateral and settled their debt with cash, their facts are distinguishable from Tufts, and, thus, they should only recognize income to the extent of the fair market value of the collateral. In Gershkowitz v. Commissioner, supra, the taxpayers did retain collateral and pay with cash. In Gershkowitz v. Commissioner, supra at 1014, the taxpayers were required to recognize gain from the cancellation of indebtedness to the extent that the balance of the debt exceeded the cash paid on extinguishment.[9]

In line with Gershkowitz, we hold that the partnerships realized income to the extent that their loan balances exceeded the consideration paid to Commercial on extinguishment.[10] This

---

[9] Respondent's analysis in Rev. Rul. 91-31, 1991-1 C.B. 19, also reaches this result. In Rev. Rul. 91-31, respondent concluded that Commissioner v. Tufts, 461 U.S. 300 (1983), and Gershkowitz v. Commissioner, 88 T.C. 984 (1987), required cancellation of indebtedness income to be recognized to the extent of the principal reduction by the "nonselling" lender of an under-secured, nonrecourse debt. Such is the case here. See also Rev. Rul. 82-202, 1982-2 C.B. 36, wherein respondent's analysis concludes that United States v. Kirby Lumber Co., 284 U.S. 1 (1931), requires a taxpayer, whose nonrecourse debt balance was reduced by the lender, to recognize cancellation of indebtedness income in an amount equal to the debt reduction.

[10] The parties agree that unpaid interest incurred on the
(continued...)

income must be recognized by the partners of Parker Properties and Twenty Mile as a separately stated item under section 702(a)(7), subject to the limitations of section 108 at the partner level.  Sec. 108(a), (d)(6); see also Estate of Newman v. Commissioner, 934 F.2d 426, 427 n.1 (2d Cir. 1991), revg. T.C. Memo. 1990-230; Gershkowitz v. Commissioner, supra at 1009.

Finally, petitioners contend that, because Riverbank purchased apartment mortgages for an amount $650,000 in excess of their fair market value, any cancellation of indebtedness income should be reduced by this amount.  Although Commercial received approximately $650,000 more than it would have, we must consider whether that excess inures to petitioners' benefit for purposes of determining taxable income.

Petitioners seek a reduction of recognizable income for the excess payment.  The payments, however, were not made on behalf of partnerships for which respondent made determinations.  Accordingly, the $650,000 excess payment does not result in a special allocation.  See, e.g., Klein v. Commissioner, 25 T.C. 1045 (1956).  Nor is this an instance where a partner is selling or contributing property to the partnership.  See, e.g., secs.

---

¹⁰(...continued)
debt is included in the cancellation of indebtedness income realized by the joint ventures to the extent that the obligation to pay interest was forgiven.

707(a), 721; <u>Barenholtz v. Commissioner</u>, 77 T.C. 85 (1981); <u>Otey v. Commissioner</u>, 70 T.C. 312 (1978).

The partnerships paid $650,000 less than Commercial was willing to accept. Therefore, Riverbank (not a party in these cases) purchased nearly $11.5 million mortgages for just over 5 percent, or $650,000, above their fair market value. This enabled the partnerships to achieve debt relief from Commercial and also provided Riverbank with new mortgages. Parker Properties and Twenty Mile did not pay the $650,000.

Both parties to the transaction had a business purpose for its consummation; Commercial realized cash on the sale of the mortgages, and Riverbank obtained assets. As part of the purchase, Riverbank, not the partnerships, is entitled to account for their acquisition. Furthermore, if the conditions warranted, Riverbank (not the partnerships) might be entitled to any potential bad debt deductions. See generally sec. 166. To hold that the partnerships should reduce their cancellation of indebtedness income by the $650,000 another entity paid would ignore the realities underlying the separate mortgage purchase agreement and the practical effects of Riverbank's separate role as the buyer. Accordingly, the partnerships are not entitled to reduce their income by the $650,000 premium paid by Riverbank.

To reflect the foregoing,

Decisions will be entered

under Rule 155.